**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**DENISE TORLONE,**

Plaintiff,

**v.**

**CIVIL ACTION NO.: 3:18-CV-53
(CHIEF JUDGE GROH)**

**NANCY A. BERRYHILL,
Acting Commissioner of Social Security,**

Defendant.

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On April 12, 2018, Plaintiff Denise Torlone ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On June 18, 2018, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On  July 18, 2018, and September 18, 2018, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>PROCEDURAL HISTORY</u>[1]

On April 5, 2014, Plaintiff protectively filed her application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") (R. 275-76). On April 7, 2014, Plaintiff further filed an application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging a date of disability that began on June 10, 2011. (R. 278-283). At the hearing, Plaintiff moved to amend her alleged onset date of disability to November 5, 2012 and the motion was granted by the Honorable Administrative Law Judge ("ALJ"), Karen B. Kostol, who presided over Plaintiff's hearing (R. 267). Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2016; therefore, Plaintiff must establish disability on or before this date. (R. 14, 284-292).

This claim was initially denied on June 30, 2014 (R. 132-136, 137-141) and denied again upon reconsideration on October 2, 2014 (R. 147-149, 150-152). On November 21, 2014, Plaintiff filed a written request for a hearing (R. 153-156), which was held before Honorable United States Administrative Law Judge ("ALJ") Karen B. Kostol on December 1, 2016 in Morgantown, W.V. with the Plaintiff and her Counsel appearing via video conference from Martinsburg, W.V. (R. 32-68). Plaintiff represented by Counsel Ambria Adkins, Esq., appeared and testified, as did Casey B. Vass, an impartial vocational expert. <u>Id.</u> On March 30, 2017, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 9-31). On February 22, 2018, the Appeals Council

---

[1] The Plaintiff, Denise Torlone, has previously filed for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on two prior occasions. Her first filing was made on February 23, 2007 and initially denied on April 25, 2007. Plaintiff next filed for "DIB" by protectively filing her Title II application on November 23, 2011. This claim was initially denied on March 14, 2012 and denied again upon reconsideration on August 2, 2012. (R. 82, Exhibit No. 3A).

denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-6).

### III.   BACKGROUND

**A.   Personal History**

Plaintiff was born on November 5, 1957, and was fifty-six years old at the time she filed this SSI claim. (R. 275, 278). She completed a high school education (R. 299) and her prior work experience included work as restaurant help and a teacher's aide. (Id.). She was single at the time she filed her claim (R. 275) and was single at the time of the administrative hearing. (Tr. 7, R. 38). She has no dependent children. (R. 271). Plaintiff alleges disability based on fibromyalgia, degenerative disc disease, herniated discs, bulging disc, arthritis, depression, and high blood pressure.  (R. 298).

**B.   Medical History**

**1.   Medical History Pre-Dating Amended Alleged Onset Date of November 5, 2012**

On March 25, 2011, Plaintiff was seen by Lee Moore, M.D. for an eye examination after she had lost her glasses. (R. 1099). Plaintiff testified at the hearing that she has "a lot of blurred vision" and that her "right eye is pulling" and the "muscle's weakening" causing her eye to "pull to the right" which gives her "double vision". (Tr. 8, R. 39). Plaintiff testified she was prescribed eye glasses. (Tr. 9, R. 40).

On March 5, 2012, Plaintiff underwent a consultative mental status examination[2] from Harry W. Hood, M.S. of Psychological Consulting in Martinsburg, West Virginia. (R. 359-362). Initially Mr. Hood made general observations regarding the Plaintiff, stating,

---

[2] This examination was conducted pursuant to Plaintiff's second application for disability insurance benefits ("DIB") filed on November 23, 2011. The claim was initially denied on March 14, 2012 and again upon reconsideration on August 2, 2012. *See* footnote 1.

3

> The claimant is a 54-year-old Caucasian woman who stands 5 feet 5 inches and weighs 195 pounds. She has blonde hair, hazel eyes, wears glasses, is right-hand dominant, has good dress and hygiene, and has no observed mobility impairments. The claimant is living alone and receives unemployment in the amount of $900 per month.

(R. 359). Next, Mr. Hood reviewed the Plaintiff's psychosocial history, stating "[t]he claimant reports being born in Logan, West Virginia and then growing up in North Carolina, Florida, and West Virginia due to her father's frequent job transfers. She is the oldest of five children. She has been married twice and divorced. She has two adult children." Id. Mr. Hood then noted that the Plaintiff's chief complaints were that "she is applying for benefits because, 'I have fibromyalgia, arthritis, back problems, and depression.'" (R. 360). Mr. Hood stated "[t]he claimant reports experiencing depression on and off for most of her life" and her disability date is given as June of 2011. Id. The Plaintiff reported work interference as Mr. Hood states "[t]he claimant reports in her last job she was missing work frequently due to physical and depressive symptoms." Id. However, it was reported by Mr. Hood that the Plaintiff "has been seeking employment." Id. Mr. Hood went on in his consultative mental examination to discuss the Plaintiff's presenting symptoms, stating,

> The claimant reports physical impairments and depression. She reports that she experiences depressed mood most days, is unable to do former activities, which increases her level of depression; has no interests in former pleasurable activities, low energy levels, low self-esteem, elevated levels of crying, sleep disturbances, and suicide thoughts without a plan or intent to harm herself.

Id. The Plaintiff did not report any history of mental treatment. Id. Mr. Hood next reviewed the Plaintiff's medical history and provided as follows,

> The claimant's primary care physician is Dr. Miller. He is following her for fibromyalgia, arthritis, and back pain. She reports a history of carpal tunnel syndrome surgery in 2008 and a breast biopsy also in 2008, which was negative. Currently, she smokes 3/4 pack of cigarettes per day. She has normal levels of caffeine. She reports a brother with depression. Her current medications are Cymbalta 60 mg q.d., Oxycodone 60 mg q.i.d., amphetamine salts 20 mg p.r.n., Valium 5 mg taken p.r.n., and morphine sulfate ER 60 mg taken p.r.n.

Id. The Plaintiff did not report any history of alcohol or drug use and Mr. Hood found no indication of alcohol or drug use prior to the interview. Id. Mr. Hood stated the Plaintiff "last worked for the Jefferson County Board of Education as a teacher's aide from 2007 until June 2011. Prior to that, she and her daughter were the owner operators of a bar and a cleaning service for approximately 10 years." Id.

Plaintiff's attitude was cooperative and her speech was clear. Id. Her mood was mildly depressed with a generally broad affect and one instance of crying during discussion of her history. Id. Her thought process was well organized and there was no evidence of delusions, phobias, or obsessions observed nor were any hallucinations or illusions present. Id. Her insight was fair and her judgment was average. Id. She reported thoughts of suicide without plan or intent to harm herself and homicidal thoughts were not reported. Id. Her immediate memory, recent memory, and remote memory were all within normal limits. Id. Her concentration was average. Id. Her psychomotor behavior, persistence, and pace were all also within normal limits. Id. Her social skills during the interview were appropriate and she rated her social skills as being average, "stating that she gets along with most people and has friends." Id. Mr. Hood diagnosed depressive disorder, pain disorder associated with psychological factors and fibromyalgia, as well as fibromyalgia and arthritis per her medical records. Id. Mr. Hood's diagnostic rationale was as follows:

> The Depressive Disorder diagnosis was made based upon the claimant's depressed mood, impairments of energy, low self-esteem, loss of interest in enjoyable activities, frequent crying, sleep disturbances, and suicidal thoughts without intent to harm herself. The Pain disorder was included due to claimant's reports that the depression is associated with the level of pain that she experiences. It is probable that with the elevated levels of pain her levels of depression increase.

Id. His prognosis of Plaintiff was poor, "in that the claimant is not receiving psychological care."
Id.

Plaintiff was seen as a new patient on May 29, 2012, by Dr. Haroon Akhtar at the Brunswick Jefferson Medical Office in Brunswick, Maryland. Plaintiff reported several hours of A.M. stiffness. (R. 382). Dr. Akhtar stated as follows,

> The patient is a 54-year old female who presents with fibromyalgia. Patient is new to Practice coming from another Dr. (William Miller) in Ranson, W.V. This Dr. was treating her for Fibromyalgia and depression. Patient has been getting monthly refills of Oxycodone tabs, 240-300 monthly according to office notes. She was advised to go to Pain Management in Frederick, MD (dated 3-16-2012 office notes) and Rheumatologist but there are no notes she has followed through as directed. Patient has no insurance at this time and may be waiting on Disability approval.

Id. Dr. Akhtar listed Plaintiff's past medical issues as fibromyalgia, depression, fatigue, backache, and breast biopsy, noting the biopsy occurred in August of 2009. Id. Dr. Akhtar further noted that she underwent surgery for carpal tunnel repair in June and July of 2009. Id. The records indicate the Plaintiff uses tobacco smoking one pack of cigarettes per day but would like to quit. Id.

Dr. Akhtar conducted a physical examination of the Plaintiff on May 31, 2012 and found that Plaintiff had bilateral paracervical, lumbar and thoracic paraspinal muscle stiffness and tenderness with a limited range of movement ("ROM") Id. Dr. Akhtar further noted that Plaintiff had no peripheral motor and sensory deficits. Id. He also stated that Plaintiff had bilateral 1st metacarpal tenderness with a painful range of movement, mild tenderness in her wrists full range of movement, and lateral epicondyle tenderness with full range of movement. Id. He stated that her general appearance was cooperative and she was not in acute distress. Id. Her chest and lung exam revealed clear to auscultation and quiet, even and easy respiratory effort with no use of accessory muscles. Id. Her cardiovascular rhythm was regular. Id. Dr. Akhtar also conducted a

mental status examination of the Plaintiff on May 31, 2012 and found her to be oriented with appropriate mood and affect. Id. She articulated well with normal speech/language, rate, volume and coherence. Id. Her thought content was normal with an ability to perform basic computations and apply abstract reasoning. Id. Her associations were intact and the Dr. found no evidence of hallucinations, delusions, obsessions, or homicidal/suicidal ideation and she demonstrated appropriate judgment and insight. Id. The Plaintiff stated that she feels her medication, Cymbalta works "somewhat" Id. She never tried physical therapy, massage, or acupuncture and was advised to do self-rehabilitation with yoga and a "miracle ball" as she cannot afford physical therapy. Id.

The Plaintiff returned to Brunswick Jefferson Medical Office on June 5, 2012. (R. 380). She was again seen by Dr. Akhtar. At that time, Plaintiff wanted to discontinue treatment for pain on narcotics and Dr. Akhtar began "tapering dose". Id. Plaintiff was seen at Brunswick Jefferson again on June 14, 2012 by Julie Beachley. (R. 378). Plaintiff came in for a refill of her Oxycodone prescription. Id. Plaintiff stated at that time that she was having trouble getting into pain management without insurance. Id.

A progress note dated June 20, 2012 indicates Plaintiff was seen by Shenandoah Preventive Medicine in Martinsburg, W.V. which specializes in pain management. (R. 407). The note states that Plaintiff has fibromyalgia, arthritis and her whole body aches. Id. Further, the note states that both of Plaintiff's legs throb and become worse at night. Id. Plaintiff also reports a possible pinched nerve in her lower back as well as numbness, tingling, and weakness. Id. While the note reveals "no specific injury", it states Plaintiff has been in a motor vehicle accident, with the date of incident presented as June 16, 2012 at "Save-A-Lot". Id. The note states that Plaintiff was "rear ended and T-boned another vehicle" causing Plaintiff to suffer

whip lash after being thrown backward. Id. The note goes on to say Plaintiff saw her family physician, Dr. Miller and has been prescribed morphine, oxycodone, Cymbalta, valium, and Adderall. Id. On this day, Plaintiff was feeling dizzy and light headed. Id.

Plaintiff returned for evaluation at Shenandoah Preventive Medicine on July 11, 2012. (R. 408). During this visit, Plaintiff stated her blood pressure had been running high all month, "which is unusual." Id. She further stated that since her pain medicine had been "cut in half" or reduced, she is unable to sleep. Id. Plaintiff further stated that both of her legs were still throbbing at night and she had been experiencing severe hot flashes. Id. Her lower back on the right side was "catching" and she was experiencing numbness, tingling, and leg weakness on occasion. Id. The progress note indicates that Plaintiff had an appointment with her family doctor scheduled for July 18, 2012. Id.

A progress note dated July 18, 2012 from Shenandoah Preventive Medicine states the Plaintiff is "achy all over." (R. 411). The note goes on to say that Plaintiff doesn't "feel well all over", experiencing numbness, tingling, and weakness in both legs and feet. Id. Plaintiff stated her toes are "always numb". Id. A note from July 24, 2012 states that Plaintiff was to be "consulted on next visit, August 8, 2012, as to compliance and pain issues". Id. The note further stated that the Plaintiff had called the office on July 24, 2012 and informed them that she had flushed her pain medicine down the toilet. Id. The office suggested she go to the Emergency Room ("ER") if needed. Id.

Plaintiff was seen on August 2, 2012, at Brunswick Jefferson Medical Office by Dr. Leonard Kinland (R. 376). The Plaintiff indicated to Dr. Kinland that her prior Dr. had retired. Id. Dr. Kinland noted that she did not have insurance. Id. He further stated that the Plaintiff was suffering from chronic pain and had been on opioids. Id. Dr. Kinland stated that Dr. Akhtar had

referred the Plaintiff to pain management. Id. He further observed that Plaintiff had been prescribed Oxycodone 30 mg "for 10/day". Id. The Plaintiff was also put on Adderall and was prescribed Clonidine to help with her blood pressure. Id. Dr. Kinland stated that the Plaintiff was currently unemployed but "took pain medicine when last employed." Id. Dr. Kinland stated that the Plaintiff presented with hypertension and her high blood pressure readings over the past month is stress related and has been taking "Colidine on/off from another doctor." Id. Dr. Kinland conducted a physical examination of the Plaintiff. Id. He stated that she was alert, her gait was normal, and she was well hydrated. Id. He noted that she was not in acute distress. Id. Her chest and lung examination revealed symmetric breath sounds and her heart rhythm was regular, revealing no evidence of murmurs. Id. Dr. Kinland observed that Plaintiff was alert and oriented. (R. 377).

In his notes of the visit, Dr. Kinland stated the Plaintiff had chronic pain and "chronic opioid use." Id. Dr. Kinland further stated that Plaintiff is "currently not able to work. . . due to being out of job" and he didn't "feel that prior dosing levels likely were justifiable." Id. Dr. Kinland advised Plaintiff for her chronic opioid use for "nonmalignant pain" that she must get a "treatment plan from pain management specialist prior to her next Rx" (prescription) given and he further limited Plaintiff's oxycodone prescription to "4 per day." Id. Dr. Kinland reviewed Plaintiff's medical records and noted that she was receiving "350" oxycodone per month. Id. Dr. Kinland did not feel that Plaintiff had "essential hypertension or at least not uncontrolled with her clonidine." Id.

A progress note dated August 8, 2012, from Shenandoah Preventive Medicine states Plaintiff was having trouble with both feet, her lower back on the left side, and generally "achy

all over". (R. 413). The note further states Plaintiff was experiencing tingling, numbness, and weakness in her left leg. Id.

A progress note dated August 15, 2012 from Shenandoah Preventive Medicine states Plaintiff was again experiencing difficulties with both of her feet and legs, indicating a feeling of numbness in both feet. (R. 415). The note goes on to state that Plaintiff's lower back was then feeling "better since she has been doing stretching" and "exercises." Id. The note indicates that during this visit, Plaintiff was evaluated and provided with a treatment plan for the use of oxycodone to manage her pain as required by Dr. Kinland per the notes of Plaintiff's visit on August 2, 2012. (Id., R. 377).

A progress note dated September 12, 2012 from Shenandoah Preventive Medicine states Plaintiff had been to the Emergency Room on August 22, 2012 where her blood pressure was reported as "217/130". (R. 417). The note states Plaintiff reported to the Emergency Room after experiencing nausea for one week and "high levels of anxiety." Id. Plaintiff was again experiencing difficulty with both of her feet and legs. Id.

Plaintiff visited the Eastern Panhandle Free Clinic as a new patient on September 13, 2012 by provider Robbie McCauley. (R. 400). A review of Plaintiff's systems indicated in regard to her cardiovascular health, that she "denies palpitations" and "edema" but that she does "get chest pains a couple times per week." Id.  The assessment of Plaintiff provided diagnoses of fibromyalgia, anxiety, hypertension, tobacco abuse, and multiple sites with arthritis. (R. 401).

A progress note dated October 10, 2012 from Shenandoah Preventive Medicine states Plaintiff had experienced continued numbness in both of her feet and legs along with pain in both of her hips and lower back. (R. 419). The progress note further states Plaintiff had been "moving

and painting" as well as "lifting a lot" and "bending over." Id. Plaintiff reported that she began getting nausea and stomach pain about two months prior to the visit. Id.

Plaintiff presented for a follow-up appointment at Eastern Panhandle Free Clinic on October 11, 2012 with provider Robbie McCauley. (R. 394). Plaintiff indicated that she did not believe her current blood pressure medicine was working reporting that her blood pressure had remained elevated. Id. Plaintiff had been prescribed and taking 5 mg Accupril for her blood pressure. Id. Plaintiff continued to report feelings of nausea and pain in her stomach/abdomen ongoing for the past couple of months to the date of her appointment. Id. She stated she had been notified that she had an infection found on her most recent pap smear conducted during her last visit to the clinic. Id. Dr. McCauley's assessment of Plaintiff indicated diagnoses of anxiety, hypertension, tobacco abuse, abdominal pain caused by cholelithiasis or GERD (gastroesophageal reflux disease), and bacterial vaginosis as found on Plaintiff's pap smear. (Id., R. 395). Plaintiff was provided prescriptions for ranitidine to help with pain and nausea, accupril for her blood pressure, and flagyl to treat bacterial vaginosis. (R. 395). Plaintiff's accupril prescription was increased to two times daily in an effort to better control her elevated blood pressure. Id.

Plaintiff returned to Eastern Panhandle Free Clinic on October 25, 2012 for a follow-up appointment with Dr. Robbie McCauley. (R. 390). Plaintiff stated that the flagyl she had been prescribed helped her to feel better. Id. Plaintiff no longer reported feeling nauseous. Id. As a result, Plaintiff was continued to be prescribed accupril for her blood pressure while ranitidine and flagyl were both discontinued. Id.

### 2.  Medical History Post-Dating Amended Alleged Onset Date of November 5, 2012

A progress noted dated November 7, 2012 from Shenandoah Preventive Medicine stated

the Plaintiff's blood pressure as "123/79". (R. 421). The Plaintiff stated her "left knee was achy", but "in general feeling pretty good today." Id.

Plaintiff was seen by Dr. Leonard Kinland at the Brunswick Jefferson Medical Office on November 20, 2012. (R. 374). During this visit, Plaintiff reported having an "arthritis flare up", however, Dr. Kinland noted that Plaintiff is feeling better following diet and exercise plan from "free clinic". Id. Significantly, Dr. Kinland noted that Plaintiff is better, "now back to work," (Id.) and that she was "managing high level activity", further noting he would "refill opioid temporarily but this would not be a suitable ongoing treatment without other modalities being exhausted." (R. 375). Dr. Kinland assessed Plaintiff as having fibromyalgia with chronic and diffuse pain. Id. Dr. Kinland also diagnosed Plaintiff with plantar fasciitis. Id. Dr. Kinland prescribed Plaintiff with a twenty-one day prescription of Oxycodone, 30 mg with no refills to help manage the pain associated with fibromyalgia. Id. Dr. Kinland also prescribed doxycycline hyclate, 100 mg to help with plantar fasciitis. Id.

A telephone call to Dr. Kinland at Brunswick Jefferson Medical Office was noted on December 4, 2012. (R. 373). Dr. Kinland again noted, significantly, that Plaintiff was "going back to work" and found it difficult to focus. Id. As a result, Plaintiff requested a prescription for Adderall. Id. Dr. Kinland provided the prescription on the condition that Plaintiff recheck monthly. Id.

A progress note from Shenandoah Preventive Medicine stated Plaintiff was again "feeling pretty good" and further stated there were no reports of "numbness, tingling, or burning." (R. 423).

Plaintiff was seen again by Dr. Kinland on January 21, 2013, where she reported low back pain and left leg numbness. (R. 370). Significantly, Dr. Kinland provided that Plaintiff's

reported symptoms began on January 18, 2013 after "falling from a roof", approximately six feet. Id. Dr. Kinland further provided that Plaintiff "works helping friend do construction". Id. Dr. Kinland stated Plaintiff had a decreased and painful range of motion in her lumbar region. Id. Dr. Kinland's diagnosis was "lumbar sprain." Id. Dr. Kinland ordered Plaintiff to have a lumbar x-ray and noted that she must consult a Rheumatologist if she needed opioids for her chronic problems. Id.

A progress note from Shenandoah Preventive Medicine dated March 26, 2013 states the Plaintiff's chief complaint was her lower back. (R. 430). Significantly, the progress note states Plaintiff fell one week ago while "roofing" after she "tripped on a tarp" and landed on her left knee cap. Id. The note goes on to say Plaintiff was experiencing numbness in her left thigh and her fibromyalgia was "coming back." Id. Plaintiff was provided a prescription for oxycodone. (R. 431).

Plaintiff was seen by Dr. Leonard Kinland at Brunswick Jefferson Medical Office on April 15, 2013. (R. 367). Dr. Kinland stated the Plaintiff presented for a follow-up regarding her back and leg pain. Id. Plaintiff indicated her pain had become worse and she was unable to sleep at night. Id. Dr. Kinland stated the Plaintiff "does construction work" and that she "wants to try to be off work for 2 weeks." Id. Dr. Kinland performed a physical examination and noted that the Plaintiff had a decreased and painful range of movement in her lumbar region. Id. Plaintiff was prescribed oxycodone, 30 mg for her pain. Id. Dr. Kinland noted that she would "plan to try a hiatus from work" and she was advised that she must "see pain management before further opioids could be prescribed." Id.

Plaintiff visited pain management at Shenandoah Preventive Medicine per a progress dated April 23, 2013. (R. 434). Plaintiff reported her chief complaints as pain and numbness in

her left hip, lower back, and left leg causing her to not be able to sleep well due to the pain. Id. The note suggests Plaintiff was further prescribed oxycodone, 30 mg to help alleviate the pain she was experiencing. (R. 435).

Plaintiff was seen by provider Robbie McCauley at the Eastern Panhandle Free Clinic on May 2, 2013. (R. 386). Plaintiff stated she had been having "pain in the left buttock that radiates down the side of the leg to the ankle" that started about six weeks prior to the date of the visit and "seems to be getting worse." Id. She stated that the pain is worse when "lying down, sitting for long periods of time, or long time standing." Id. Dr. McCauley assessed Plaintiff as having anxiety, hypertension, arthritis, tobacco abuse, and "left sciatica – most likely." Id. Plaintiff was prescribed Naprosyn, 500 mg and Accupril, 5 mg. (R. 387). Plaintiff was referred to physical therapy for back strengthening exercises and scheduled to return to the clinic for follow up in one month to evaluate the effectiveness of the physical therapy. Id.

Plaintiff was initially evaluated as a new patient for physical therapy at WVU Hospitals – Jefferson Memorial Hospital, Outpatient Rehabilitation Services Department on May 14, 2013 by Tamara DeLeon, MPT. (R. 403-406). Plaintiff was diagnosed with chronic back pain and left hip pain. (R. 403). Plaintiff reported her pain began approximately six months prior to the date of her evaluation. Id. Plaintiff reported experiencing pain in her left buttock radiating to her ankle as well as numbness and pain in her feet. Id. Plaintiff's medications reported were oxycodone, morphine, and blood pressure medicine. Id. She was assessed as having a restricted range of mobility and flexibility, decreased strength, decreased functional activity, loss of endurance, pain limiting function, muscle tightness and weakness, and radicular complaints, all of which would benefit from physical therapy. (R. 404-405). Her treatment plan included physical therapy three to four times a week for a total of ten visits. (R. 405). Her treatment was to include flexibility and

range of motion strengthening exercises, therapeutic exercise, joint mobilization, manual therapy, mechanical traction, electrical stimulation, ultrasound, moist heat, and ice. Id.

Plaintiff received an MRI of her lower back on May 17, 2013 in Frederick, Maryland by Dr. Artin Aharonian. (R. 1092). Dr. Aharonian made the following findings and impressions based on a review of her MRI:

> The alignment of the lumbar spine is within normal limits. The lumbar vertebral bodies are maintained in height without compression deformities. The L1-2, L3-4, and L4-5 intervertebral disks are diminished and height and signal compatible with mild-to-moderate degenerative disk disease. The remaining lumbar intervertebral disks are diminished in signal compatible very mild degenerative disk disease. Conus medullaris unremarkable. Mild-to-moderate posterior facet arthropathy is noted at the L5-S1 level. Moderate posterior facet arthropathy is noted at the L4-5 level. There is a tiny annular tear L4-5 vertebral body lateral of midline with a 0.3 cm tiny disk herniation at the left lateral recess with possible mass effect in the region. NO additional focal abnormalities are detected. Soft tissues and muscle bundles are unremarkable.

(R. 1092). Dr. Aharonian diagnosed Plaintiff as having degenerative disk disease, posterior facet arthropathy, and a tiny annular tear left of her midline with 0.3 cm disk herniation. Id.

A progress note from Shenandoah Preventive Medicine dated May 21, 2013 indicated Plaintiff was scheduled to have all of her remaining teeth extracted on June 4, 2013. (R. 436).

Plaintiff was seen by Dr. Annie Gibson to establish as a new patient at the Montgomery Village Pain & Rehabilitation Center in Montgomery Village, Maryland on May 29, 2013. (R. 450). Plaintiff reported suffering from chronic lower back pain, fibromyalgia, and arthritis. Id. It was noted that Plaintiff had been under the care of Dr. Miller for eight years until he retired. Id. Plaintiff wanted to establish a new doctor-patient relationship that could manage her pain "at the right level as Dr. Miller." Id. It was indicated that Plaintiff had been prescribed oxycodone, oxycontin, and BZO for which she tested positive during this visit. (R. 451). Plaintiff was further prescribed oxycodone, methadone, and soma. Id. Plaintiff was directed to follow-up in one month. (R. 452).

Plaintiff presented at Montgomery Village Pain & Rehabilitation Center for her follow-up appointment on June 26, 2013. (R. 453). In discussing the history of her illnesses, it was noted that Plaintiff had performed "manual labor all her life" and she feels her chronic lower back pain may stem from that along with her fibromyalgia. Id. It was further noted that Plaintiff suffers from associated anxiety and depression and that she is frustrated not being able to sleep. Id. Plaintiff's "problem list" was noted to include chronic back pain, anterior leg pain, and chronic hip pain in addition to her fibromyalgia, degenerative disc disease, facet arthropathy of spine, annular disc tear, and disc herniation. (R. 454). Plaintiff's prescriptions for soma, methadone, and oxycodone were renewed. Id.

A progress note from Shenandoah Preventive Medicine dated July 16, 2013 indicates Plaintiff had suffered a "15 ft. fall almost a week ago." (R. 440). Plaintiff's neck was "jarred" by the fall and was in severe pain during the visit. Id.

Plaintiff was seen at Montgomery Village Pain & Rehabilitation Center by Dr. Annie Gibson on July 24, 2013 for a follow-up appointment. (R. 456). Dr. Gibson noted that the context of plaintiff's pain was "recurring hard labor." Id. Plaintiff stated she was feeling a "throbbing pain" at the base of her skull from where she had fallen from a "15 ft. ladder" onto a brick floor causing her neck to be "jarred." Id. It was noted that Plaintiff tries to do stretches every day and tries to walk two blocks every day. Id. Plaintiff's prescriptions for oxycodone, methadone, and soma were renewed. (R. 458). Plaintiff stated her medications are working well. Id.

A progress note from Shenandoah Preventive Medicine dated October 8, 2013 indicates Plaintiff was experiencing lower back pain that radiated down her left leg. (R. 446). These complaints continued in addition to experiencing numbness in her left leg and pain in her hip

during her visit to Shenandoah Preventive Medicine on November 14, 2013. (R. 448). It was noted during Plaintiff's visit on November 14, 2013 that Plaintiff's occupation at that time was "self-employed, cleans houses." Id.

On November 13, 2013, Plaintiff presented at Montgomery Village Pain & Rehabilitation Center for a follow-up appointment. (R. 468). Plaintiff stated "she had a rough month because she has been very active." Id. It was noted that Plaintiff was being managed for chronic lower back pain and stated she was sore, stiff and has had increased pain. (R. 470). It was reported that Plaintiff had made a trip to North Carolina and back, which was noted as the likely cause of her increased pain. Id.

Plaintiff presented to Harpers Ferry Family Medicine on February 12, 2014 to establish care as a new patient. (R. 504). It was noted that Plaintiff was reporting to a free clinic that started her on Lisinopril for her blood pressure. Id. She stated that since taking the Lisinopril, her blood pressure was not well-controlled. Id. She stopped taking the Lisinopril and started taking clonidine that she had from a previous prescription and since that time, her blood pressure had been controlled. Id. At this time, Plaintiff was not experiencing any edema or muscle and joint pain or swelling according to a review of Plaintiff's symptoms. (R. 505).

Plaintiff presented to Montgomery Village Pain and Rehabilitation Center for a follow-up appointment on April 3, 2014, for her chronic lower back pain. (R. 488). Plaintiff stated her medications were working properly. Id. Plaintiff was provided prescriptions for Klonopin, Neurontin, methadone, and oxycodone. (R. 490-491).

Plaintiff presented to Harpers Ferry Family Medicine for a follow-up appointment on April 11, 2014. (R. 525). A note from the visit indicates Plaintiff requested an MRI due to neck pain following "15 foot fall off ladder 6 months ago." (R. 526). Dr. Aaron McLaughlin noted

that an MRI was requested by neurosurgery but could not be accepted by insurance. Id. Dr. McLaughlin noted he would order the MRI of Plaintiff's neck. Id.

Plaintiff presented to establish as a new patient at Frederick Spine Rehabilitation Center on August 20, 2014. (R. 589). Plaintiff was seen by Dr. Jeanne Smoot. Id. It was reported that Plaintiff was seeking chronic pain management and it was noted that Plaintiff had fallen from a "15 foot ladder many years ago." Id. Plaintiff's chief complaints were fibromyalgia, chronic low back pain, and arthritis. Id. A physical examination did not reveal any lower extremity swelling and it was indicated that Plaintiff had a normal range of movement and strength. (R. 590).

Plaintiff returned to Frederick Spine Rehabilitation Center on December 9, 2014 for a follow-up appointment. (R. 574). Plaintiff reported she had fallen about two weeks prior to her appointment and was experiencing a heightened level of neck pain. Id. Plaintiff reported she attempted to get an MRI on her neck "3 months ago", however it was noted that Medicaid would not cover it. (R. 375).

Plaintiff was seen again at Frederick Spine Rehabilitation Center on January 6, 2015. (R. 570). During this appointment, Plaintiff reported experiencing bilateral hand pain stating she could not hold anything for more than "a couple of minutes and her hand starts aching really bad." Id. A review of Plaintiff's cardiovascular system indicated she was not experiencing any chest pain, chest tightness or pressure, lightheadedness, palpitations, ankle swelling, or any edema of the extremities. (R. 571).

Plaintiff was seen at Harpers Ferry Family Medicine on January 21, 2015 by Dr. McLaughlin for a follow-up appointment. (R. 537). It was noted that Plaintiff was experiencing headaches nearly every day in the back of her head and in her neck. Id. Plaintiff was suffering from degenerative disc disease in her neck and continued to seek pain management. Id. Plaintiff

was continuing to take clonidine for blood pressure and denied experiencing any chest pain, palpitations, and shortness of breath. Id. It was noted that Plaintiff had "no leg swelling" at this time. Id. It was further noted that Plaintiff's hypertension was "reasonably controlled." (R. 538).

Plaintiff was seen at Frederick Spine Rehabilitation Center on March 3, 2015 for a follow-up appointment. (R. 562). It was reported that Plaintiff's medications were working well and she was not experiencing any new pain. Id. A review of Plaintiff's systems did indicate in a report of her cardiovascular system that Plaintiff was experiencing "mild" ankle swelling. (R. 563). Plaintiff continued to be prescribed clonidine, oxycodone, methadone, Neurontin, soma, and escitalopram. (R. 565).

Plaintiff was again seen at Frederick Spine Rehabilitation Center on May 27, 2015. (R. 553). It was reported in a review of Plaintiff's cardiovascular system that Plaintiff was experiencing mild, intermittent ankle swelling. (R. 554). Plaintiff reported during this visit she had been experiencing a migraine and felt very dizzy, as if she may pass out. (R. 553). Plaintiff indicated she may go to the Emergency Room if symptoms persisted. Id. It was further reported that Plaintiff's medications were "working well." Id.

Plaintiff self-reported to the Emergency Department of Jefferson Medical Center on August 17, 2015. (R. 888). Plaintiff was experiencing severe pain in her hips after suffering a fall caused by tripping over a vacuum cord on August 13, 2015. (R. 891). Plaintiff stated the pain was radiating into her groin muscles. Id. No edema was reported in Plaintiff's extremities and was noted that Plaintiff had a full range of motion in her extremities. (R. 893).

Plaintiff was seen at Harpers Ferry Family Medicine on August 31, 2015 by Dr. Aaron McLaughlin. Plaintiff complained of having a "skin problem" and indicated she believed that the skin problem started with some "flea bites." (R. 603). It was noted that Plaintiff had "combed

them out of her dog over the weekend and got a few bites on her right ankle." (R. 604). Plaintiff had "cleaned out a bunch of junk from her back porch – there was evidence of birds and mice there." Id. The next day it was "reddened and swollen – she still has some edema in her ankle." Id. Plaintiff had "raised welts" on her left buttock and some on her "right upper arm." Id. It was noted that Plaintiff had mild edema in both shins and ankles. Id. Plaintiff was diagnosed with pigmented purpura, a benign rash caused by "leaky capillaries and goes along with her mild edema." (R. 605). Plaintiff was advised to elevate her legs and return for recheck if the "edema is not resolving with supportive treatment." Id.

Plaintiff was seen again by Dr. McLaughlin on October 9, 2015, at Harpers Ferry Family Medicine, presenting with leg swelling, joint pain, rash, fatigue, palpitations, and chest pain. (R. 627). Plaintiff stated she then had pain in her legs along with the swelling spanning over the past two weeks and felt like her leg is "heavier" with an increase in pain. Id. She stated there were no alleviating or worsening factors and was not experiencing any "radiation of the chest pain." Id. Plaintiff was diagnosed with leg swelling, chest pain, and essential hypertension. (R. 629). Dr. McLaughlin prescribed Plaintiff with HCTZ, hydrochlorothiazide to treat her leg swelling and ordered a cardiac stress test, echo cardiogram, and lipid panel to assess underlying cardiovascular causes of her chest pain, leg edema, and hypertension. Id. Plaintiff underwent an echo cardiogram on November 2, 2015 and received the results of the test on November 3, 2015. (R. 655). Dr. Ngoc Phuong Nguyen noted the following:

> Echo with mild diastolic dysfunction. 10-year ASCVD (atherosclerotic cardiovascular disease) risk of 9.8%. Will need to start on statin therapy. As in regard to her diastolic HF (heart failure), will need to control her blood pressure in accordance to guideline, less than 140/90. She is currently on a diuretic for leg edema . . . Advised patient to start on health diet and exercise for weight loss in regard to elevated blood sugar and for ASVCD risks. She will need to stop smoking as well. Still waiting for the exercise stress test.

Id.

Plaintiff presented at Harpers Ferry Family Medicine on December 10, 2015 with leg swelling. (R. 716). Plaintiff was seen by Dr. McLaughlin for a follow-up in regard to the swelling of her extremities. Id. Dr. McLaughlin noted that Plaintiff had been taking HCTZ (hydrochlorothiazide) with "some improvement." Id. He further noted that Plaintiff went to see a Rheumatologist and requested Dr. McLaughlin order several blood tests on the Plaintiff. Id. Dr. McLaughlin stated there was "no pain related to the swelling" but that she "did have a few days where she could not get her feet into her shoes as the swelling was so bad." Id. Dr. McLaughlin decided to switch Plaintiff from HCTZ to Lasix, "as it is a more potent diuretic." (R. 718). However, Plaintiff called Harpers Ferry Medicine stating the Lasix had not helped the swelling and she was experiencing dizziness. (R. 729). Plaintiff was informed she could resume treatment with HCTZ on December 18, 2015. Id.

Plaintiff was seen at Frederick Spine Rehabilitation Center on February 2, 2016 for a routine follow-up appointment. (R. 775). It was stated that Plaintiff had "no new pain" and her medication was "working well." Id. It was noted that Plaintiff has "had mechanical falls over the last month, not due to increasing weakness." Id. It was further noted that Plaintiff "had episodes of bilateral lower extremity edema", "is scheduled to have stress test", and "had echocardiogram which showed that her heart was not resting well." Id.

Plaintiff self-reported to the Emergency Department of Jefferson Medical Center on March 16, 2016 reporting a knot in her right ankle and presenting with swelling in both of her legs. (R. 958). The severity was listed as moderate and onset quality was sudden. Id. Plaintiff was not experiencing chest pain or shortness of breath. Id. Plaintiff reported that her symptoms have "been present for a 'couple months.'" Id. Plaintiff further reported she was prescribed Lasix by her primary care physician "with no relief." Id. Plaintiff also reported swelling on "anterior

portion" of her right ankle. Id. Plaintiff stated she had blood work done "3 months ago that showed she was pre diabetic." Id.

Plaintiff was seen by Dr. McLaughlin on May 4, 2016 at Harpers Ferry Family Medicine. (R. 793). Plaintiff's chief complaints were ankle pain, headache and a memory problem. Id. During this appointment, Plaintiff requested a referral to a neurologist. Id. Plaintiff reported having "lots of 'electrical shocks' occurring all over her body." Id. She reported experiencing "shocks" in her "hand, arms, and feet." Id. She reported recently continuing with her medication Neurontin through "pain management" after being "off it for 2 months because of swelling in her extremities." Id. Plaintiff further reported headaches happening on a daily basis and "short-term memory loss happening 'all the time' now." Id. It was noted that Plaintiff was never able to get her stress test as her medical providers "went back and forth with her insurance" before finally approving it, however, Plaintiff stated no one called her. Id. Plaintiff was further concerned about "lumps that have formed around her right ankle" but they were not causing any pain. Id. It was again noted that Plaintiff was still experiencing "pitting edema bilaterally" in her extremities. (R. 795). However, her Dr. noted that Plaintiff's "edema was minimal today." Id. It was stated that Plaintiff was experiencing "dyspnea on exertion." Id. Her Dr. believed it was "most likely related to obesity, sedentary lifestyle, and smoking." Id. Plaintiff was counseled "on weight loss, increased activity and smoking cessation." Id.

Plaintiff reported to Frederick Spine Rehabilitation Center on May 24, 2016 for a routine follow-up appointment. (R. 822). Plaintiff stated she is not taking any new medications and her current medications were working. Id. Through a review of Plaintiff's cardiovascular system it was noted that Plaintiff had "edema in lower extremities" but that it was "improved." Id.

Plaintiff reported to Frederick Spine Rehabilitation Center again on June 21, 2016 for a routine follow-up appointment. (R. 869). It was reported that Plaintiff had low back pain and her range of motion was limited due to the pain. Id. Notes of the visit indicate in a review of Plaintiff's cardiovascular system that she was not experiencing chest pain or palpitations. Id. Again, it was reported that Plaintiff exhibited edema in her lower extremities but it was "improved." Id.

Plaintiff was seen by Dr. Patrick M. Capone at Winchester Neurological Consultants on August 8, 2016 per Dr. McLaughlin's referral of Plaintiff on May 4, 2016. (R. 1035). Plaintiff reported recent migraines, muscle tension headaches, and insomnia. Id. Plaintiff complained of numbness and tingling. Id. It was noted that Plaintiff was identified "to have a BMI out of normal parameters" and it was discussed with Plaintiff regarding a "diet low in saturated fats with calorie counting" and "moderate exercise of 30 minutes duration three times per week was advised." Id.

Plaintiff was again seen at Frederick Spine Rehabilitation Center on September 13, 2016. It was reported that Plaintiff had swelling in her lower extremities but it was again, "improved." (R. 1095). At this time, it is noted that Plaintiff was not experiencing chest pain or palpitations. Id. Records from Frederick Spine Rehabilitation Center dated October 11, 2016 (R. 1129) and November 8, 2016 (R. 1131-32) provide the same assessment as noted above in the records dated September 13, 2016.

### 3.  Medical Reports/Opinions

#### a.  *Disability Determination at the Initial Level*

On June 6, 2014, agency reviewer James Binder, M.D. reviewed Plaintiff's records and completed a physical Residual functional capacity ("RFC") assessment. (R.81). Dr. Binder found

the following medically determinable impairments: 1) DDD (Disorders of Back – Discogenic and Degenerative) (primary, severe); 2) Fibromyalgia (secondary, severe); 3) Osteoarthritis and Allied disorders (other, severe); and 4) Affective Disorders (other, nonsevere). (R. 86-87). Plaintiff was found to have the capacity for work like activity in a work environment that can accommodate her physical limitations. (R. 87). Dr. Binder further found the following exertional limitations: Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; Plaintiff could stand and/or walk about 6 hours in an 8-hour work day; sit about 6 hours in an 8-hour workday. (R. 88). He found Plaintiff's ability to push and/or pull to be unlimited, other than shown, for lift and/or carry. Id. As to postural limitations, he found that Plaintiff could frequently climb ramps, stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl. (R. 89). No manipulative, visual, or communicative limitations were found. Id. As to environmental limitations, Plaintiff could have unlimited exposure to wetness, humidity, and noise; should avoid concentrated exposure to vibration, should avoid concentrated exposure extreme cold;  could have unlimited exposure to extreme heat as well as fumes, odors, dusts, gases, poor ventilations, etc. (R. 89-90).

### b. *Mental Status Examination*

On June 25, 2014, Harold D. Slaughter, Jr., M.A. reviewed Plaintiff's records and completed a mental status examination of Plaintiff pursuant to medical records indicating depression and anxiety. (R. 498-501). Plaintiff was cooperative, her speech was without impediment. (R. 500). Plaintiff was oriented in all spheres, her mood was cheerful, her affect was broad, and her thought process was within normal limits. Id. Plaintiff's thought content was coherent and relevant to topic, her insight and psychomotor behavior were both within normal limits. Id. Plaintiff did not report any suicidal or homicidal ideations. Id. Her immediate, recent,

and remote memories were all within normal limits. Id. Her concentration was average and her persistence was within normal limits. Id. Mr. Slaughter, Jr. diagnosed Plaintiff with unspecified depressive disorder. (R. 501). His diagnostic rationale was as follows: "[d]epression diagnosis is primarily based on her current treatment with Lexapro and the claimant's statement that prior to the medication she was feeling more depressed and was having frequent crying spells and irritability." Id. His prognosis of Plaintiff was good with continued treatment. Id.

On June 30, 2014, agency reviewer Philip E. Comer, Ph.D., reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") assessment. (R. 87). Dr. Comer stated the following in regard to Plaintiff's affective disorders: Her restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace are all mild. Id. He further noted that Plaintiff has had no repeated episodes of decompensation of any extended duration. Id. In addition, Dr. Comer provided that while claimant's statements are reasonably consistent with her treatment records and are credible, her limitations are largely physical and she appears to have the mental and emotional capacity for work like activity in a work environment that can accommodate her physical limitations. Id.

4. *Disability Determination at the Reconsideration Level*

On September 29, 2014, agency reviewer, Rabah Boukhemis, M.D. reviewed the prior RFC assessment and found no new evidence, providing that the "RFC above does not change." (R. 115).

On September 30, 2014, agency reviewer, Holly Cloonan, Ph.D. reviewed the prior PRT assessment and stated she had reviewed all the evidence in the file and affirmed the PRT assessment of June 30, 2014 as written. (R. 112).

### a. *Consultative Examination*

Plaintiff was seen by Dr. Seth Tuwiner of the Virginia Center for Neuroscience for a disability determination consultative examination on September 27, 2016. (R. 1082). Dr. Tuwiner stated the reason for the consultation was for evaluation of Plaintiff's fibromyalgia, degenerative disc disease, herniated disc, bulging disc, arthritis, and depression. Id. Dr. Tuwiner stated Plaintiff provided she has had back pain for three to four years. (R. 1083). He stated her pain is persistent in the "lumbosacral spine without radicular features." Id. Plaintiff stated her symptoms are worse with bending or twisting. Id.

Plaintiff noted having arthritis in her hands, feet, ankles, and shoulders for the past ten years. Id. However, Dr. Tuwiner noted that Plaintiff has never seen a rheumatologist and has not had recent x-rays. Id. Plaintiff reported having fibromyalgia with diffuse pain for the past six years. Id. Dr. Tuwiner noted Plaintiff has a history of hypertension, high cholesterol, migraine headaches, and bilateral median nerve release surgery. Id. Dr. Tuwiner noted that Plaintiff takes the following medications: clonidine, atorvastatin, escitalopram, Neurontin, hydrochlorothiazide, methadone, oxycodone, and nortriptyline. Id.

Dr. Tuwiner stated Plaintiff can do all activities of daily living and can stand or walk for five minutes at a time. (R. 1084). Dr. Tuwiner found no "clubbing, cyanosis or edema" in Plaintiff's distal extremities. Id. He stated Plaintiff's cervical range of motion was normal, her dorsolumbar range of motion had limitation in forward flexion to 70 degrees. Id. Her "lateral extension and backward extension, bilateral hip, knee, ankle, shoulder, elbow, wrist, finger and thumb joint range of motion" were all normal. Id. However, Plaintiff expressed pain with all aspects of the range of motion testing, "particularly the shoulders and the hips." Id. Dr. Tuwiner reported in his functional assessment the following:

> The number of hours the claimant can be expected to stand and walk in an eight-hour day is approximately five to six hours. She has no limitation with sitting. She does not require an assistive device. She has frequent postural limitations with bending, stooping and crouching. She has no manipulative limitations. The amount of weight she can lift both frequently and occasionally is approximately 40 pounds occasionally and 20 pounds frequently.

(R. 1085).

**C.**     **Testimonial Evidence**

At the ALJ hearing held on December 1, 2016, Plaintiff testified that she was not married and lived with a roommate. (R. 38). Plaintiff testified that she was able to drive, "but not every day." (R. 39). She testified that, "some days, I have too much dizziness or grogginess in my head that I just don't feel comfortable driving." Id. Plaintiff testified that she last worked for Jefferson County Schools as a teacher's aide and Dove Limited Liability, helping out on the weekends at a pizza place, stating:

> A: Well, I – yeah, both of those, I mean, because I would help my – out on weekends at the pizza place, which the corporation name was Dove LLC, but the actual name of it wa, you know , the pizza, so – but I worked in both at the same time . . .

(R. 42). The ALJ asked Plaintiff if her onset date had been amended to November 5, 2012 and Plaintiff responded that was correct. Id. The ALJ asked Plaintiff if, since that date, she had done any work for pay and Plaintiff responded she had not. Id. The ALJ further asked if Plaintiff had "done any volunteer work, even though you might not have paid – been paid to do it?" Plaintiff responded, "No." Id.

Plaintiff testified she was at one point prescribed oxycodone, taking 240 to 300 tablets per month. (R. 42-43). Plaintiff testified she had a history of carpal tunnel syndrome and corrective surgery. (R. 43). Plaintiff testified she is currently taking methadone for chronic back pain and fibromyalgia. (R. 44). Plaintiff testified that as a teacher's aide, she would consistently lift "maybe 20 pounds" per day and at times when helping the children around, requiring her to

lift the children or large stacks of paper, she may be required to lift up to 50 pounds. (R. 45). She testified that she left the job because she could no longer perform it adequately. Id.

Plaintiff further testified that she previously worked for a period of time at the Underground Casino & Lounge doing cleaning on a part-time basis. (R. 46). She also testified that she worked helping her daughter at the bar her daughter owned and operated, the Fifth Avenue Bar & Grill. (R. 47). The ALJ noted that in Plaintiff's record, Plaintiff reported she worked in construction.[3] When asked regarding her construction work, Plaintiff responded:

> A: I helped a gentleman that I knew for a part-time basis. Yeah, actually, I did do a little bit of construction. Helped him roof a couple houses, and did just general building walls, you know, from two-by-fours, yeah.

(R. 49-50). When asked if she was paid for this work, Plaintiff testified she was paid "$10 an hour." (R. 50). The ALJ asked the Plaintiff what condition or conditions she has that lead her to believe she cannot work at this time. (R. 51). Plaintiff responded that she suffers from fibromyalgia which causes constant pain. Id. She stated "[t]here's no place on my body that you can touch that I don't feel pain." Id. She further stated that it "feels like having the flu 24/7." Id. Plaintiff further testified that she has back issues and is in constant pain with her back. Id. She stated she cannot "walk for any period of time", no more than "five, ten minutes would be maximum." Id. She testified that she "cannot sleep at night" due to "the anxiety and depression." Id.

Plaintiff testified that as a result of back pain, she is unable to get through a load of dishes, cook, or take a shower, stating that she fears her leg will give out causing her to fall. (R. 52). Plaintiff later testified upon questioning from her attorney that she suffers from leg swelling and edema. (R. 53). She stated her legs "stay swollen." Id. She testified that she takes a fluid pill,

---

[3] The undersigned notes that the reports of Plaintiff working in construction (January 21, 2013 (R. 370 ); March 26, 2013 (R. 430); April 15, 2013 (R. 367); and July 16, 2013 (R. 440 )) are subsequent to her amended alleged onset date of November 5, 2012.

hypochlorathiazide, and must keep her legs elevated "pretty much all day" in order to help with the leg edema. (R. 53-54). Plaintiff then testified that in regard to her depression and anxiety she often experiences crying and "just overwhelming feeling of worthlessness." (R. 56). She testified that she tries to walk and exercise in the mornings but cannot make it more than ten minutes. Id. She stated she can only stand in one spot for five minutes and can sit straight up, "maybe 20 to 30 minutes." Id.

**D.      Vocational Evidence**

Also testifying at the hearing was Casey Vass, a vocational expert. (R. 59).  Mr. Vass characterized Plaintiff's past work as a teacher's aide as light "by the DOT" however, as described by the Plaintiff, Mr. Vass characterized it as medium and semi-skilled work with a specific vocational preparation ("SVP") of 3. (R. 61).  For her work cleaning as a janitor, Mr. Vass described the exertional level as medium, semi-skilled, with an SVP of 3. Id. Finally, for Plaintiff's work as a bar manager, Mr. Vass characterized her work as light in exertion, skilled employment, with an SVP of 7. Id. With regard to Plaintiff's ability to return to her prior work, Mr. Vass gave the following responses to the ALJ's hypothetical:

> Q:      And assume an individual the same age, education, and past work experience as the claimant with the following abilities. That individual is capable of medium exertional level work, can frequently climb ladders, ropes, or scaffolds, ramps or stairs, balance, stoop, crouch, kneel, or crawl. That individual must avoid concentrated exposure to extreme cold and must avoid concentrated exposure to any hazards, such as dangerous moving machinery and unprotected heights. Can individual with these limitations perform the claimant's past work?
> A:      The – all three jobs.
> Q:      And is that as it's generally performed or is – as performed or - -
> A:      It would be both. She indicated she's lifting 50 pounds as a teacher's aide, which would still be medium.
> Q:      At the light exertional level, with all of the limitations previously given, would any of the past work remain available?
> A:      Well, the janitor job would be out. Teacher's aide is out as she described and by the DOT. Bar manager is in at light.
> Q:      So the bar manager is both as performed and as generally performed?

> A:   Yes, it's light.
> Q:   Light. And the teacher's aide is as is generally performed but not as described.
> A:   Correct.
> Q:   Okay. If you add a limitation that said individual is capable of no more than frequent fingering and handling with the right upper extremity, would that eliminate any of the past work?
> A:   Would not.

(R. 61-63). Incorporating the above hypothetical, the ALJ then questioned Mr. Vass regarding

Plaintiff's ability to perform her past work given production quotas:

> Q:   Yeah. If you add a limitation that said individual is limited to a job that requires no strict production quotas, would that eliminate any of the past work?
> A:   Strict production quotas, I would eliminate the bar manager.
> Q:   And the teacher's aide would still remain available?
> A:   Teacher's aide, production quota for a teacher's aide, I don't think there is a production quota.
> Q:   All right. If you add a limitation that said individual is capable of work with only occasional changes in the work setting, in addition to no strict production quotas, would that eliminate any of the past work?
> A:   It would eliminate the bar manager.
> Q:   It would not eliminate the teacher's aide?
> A:   It's usually a pretty set standard and routine. And you know, classes are the same. Everything's on a schedule.

(R. 63-64). The ALJ next questioned Mr.Vass about Plaintiff's ability to work if she is

completely credible as to the severity of her condition:

> Q:   Okay. And if the individual were off task or to miss work 20% of the work period or greater, would there be jobs available for this individual?
> A:   No.
> Q:   How much time off task do most employers tolerate?
> A:   10% at the workstation.

(R. 65). Finally, the ALJ incorporated the above hypotheticals and questioned Mr. Vass as to

whether, under these circumstances, any jobs are available that Plaintiff would be capable of

performing:

> Q:   Okay. And with the hypothetical that - - with the occasional changes in the work setting and the no strict production quotas which left in the teacher's aide job, would there be other light jobs that would be available with those additional limitations - - with those limitations?

> A:    No strict production quotas and occasional changes. I would list a mail clerk, code 209.687-026, 120,000 jobs in the nation, 3,700 in the region.[4] Office assistant, code 2 39.567-010, 85, 600 jobs in the nation, 2,400 jobs in the region. A counter clerk, code 249.366-010, 214,700 jobs in the nation, 5,000 in the region. These are light jobs, SVP 2.
>
> Q:    And if the individual were off task or to miss work 20% of the work week or greater, would there be jobs available for this individual?
>
> A:    Yeah, that would be number 12, no jobs.
>
> Q:    If the individual must be afforded the opportunity for brief 1 to 2 minute changes of position at intervals not to exceed 30 minutes without being off task, would that teacher's aide job remain available?
>
> A:    As long as they aren't off task, they would.

(R. 65-66).  Plaintiff's attorney then questioned Mr. Vass:

> Q:    Mr. Vass, if the hypothetical person needed to elevate their legs throughout the workday a total of maybe 20 minutes every 2 hours, would they be able to do that still perform the teacher's aide and bar manager jobs?
>
> A:    Is that elevated at waist level, ma'am?
>
> Q:    Yes, Your Honor - - or yes.
>
> A:    No.
>
> Q:    No further questions, Your Honor.

(R. 67).

## E.    Disability Reports

A Disability Report Form - Appeals dated November 24, 2014 states a change in Plaintiff's daily activities. Plaintiff stated the following in regard to changes that had occurred in her daily activities since she last completed a disability report: "Feels that balance has become bad; has had several falls. Has had difficulty getting out of chair. Limited driving and walking has difficulty with stairs. Has difficulty with disorientation and with headaches." (R. 336).

## F.    Lifestyle Evidence

On an adult function report dated May 13, 2014, Plaintiff, when asked how her illnesses, injuries, or conditions limit her ability to work, stated the following:

---

[4] Mr. Vass indicated when asked what specific region of the country he would use as reference concerning the existence and number of jobs that he would use the region of West Virginia, Maryland and Pennsylvania. (R. 60-61).

> I am unable to work for several reasons. My back pain does not allow me to be very active. I cannot work, sit, or stand for more than a few minutes at a time. My fibromyalgia/depression causes my body to want to sleep constantly because my back pain wakes me every 1-2 hours. I am left exhausted, sleep, tired and in constant pain. I get overwhelmed and become anxious and cry a lot.

(R. 307). When asked to describe what she does from the time she wakes up until going to bed, Plaintiff stated, "[b]ecause I can never sleep more than 1-2 hours at a time, basically all I do is sit in my recliner with the T.V. on. I fix cereal or a sandwich or oatmeal when I get hungry and go back to the recliner." (R. 308). Plaintiff further stated she is unable to "take baths, cannot lay flat in bed, cannot have intimate relations and cannot walk for long periods or stand very long." Id. Plaintiff stated she frequently wakes up with severe pain and her legs will go numb. Id. As to how her conditions impact her personal care, Plaintiff stated she must sit down to put on her pants, socks, and underwear. Id.

She stated she must take showers because she cannot get down or up from bath. Id. She stated in regard to using the restroom that if she sits too long her legs will go numb and causes her to be incapable of getting back up. Id. She stated that she keeps her medicine in a daily pill container with A.M. and P.M. labels to remind her to take her medicine. (R. 309). She stated she used to be capable of preparing several course meals but no longer is able to. Id. In regard to house and yard work, Plaintiff indicated she does her laundry by "carrying a few things to the machine" but she cannot carry a "full laundry basket." Id. She stated she does her laundry a couple of times a week and "probably" takes her "a little longer than normal." Id.

Plaintiff stated she is not able to push or pull a lawn mower or a vacuum and therefore cannot do much house or yard work. (R. 310). She indicated that she does not go out of the house except to the store or for appointments because she does not "feel up to going anywhere unless I have to." Id. She stated that she can go out alone but doesn't like to and will not go very far on her

own. Plaintiff provided that her ability to drive is very limited. Id. Plaintiff's hobbies are watching television and reading news on the computer and she does this daily. (R. 311). She stated she typically will fall asleep watching television or reading. She indicated that she does not attend any social events because she gets too anxious that she might start "hurting too bad" and will need to sit or lie down and "be uncomfortable." (R. 312).

Plaintiff stated she can only walk for a few minutes before needing to stop and rest and must rest for 10 to 15 minutes before she can resume walking. Id. She stated she can only pay attention for 30 minutes to 1 hour and when reading instructions she must keep re-reading each step in order to follow it. Id. Plaintiff stated she gets along well with authority figures. (R. 313). Plaintiff provided that she lost her previous job as a teacher's aide because they did not renew her last job contract as a result of her not being able to stay focused and "complete all of my tasks and job requirements." Id. She indicated that she does not handle stress well because it causes her to become "more depressed and cry." Id. Plaintiff stated she uses a "TENS Machine" and a "heating pad" as well as a back brace for relief from her back pain. Id.

In a personal pain questionnaire dated May 13, 2014, Plaintiff reported pain her back that starts in her lower back and radiates throughout her left hip and legs. (R. 315). She further reported pain in her neck. Id. Plaintiff stated her pain generally lasts all day and "really never stops." Id. She reported her pain is worse when she walks or stands for more than a few minutes and at times her pain will cause her to cry. Id. She further reported that she gets some relief when sitting in her recliner with a heating pad, TENS machine, and medication. Id. Plaintiff reported that she takes oxycodone, methadone, and klonopin. (R. 316). She stated her medications cause drowsiness. Id.

Plaintiff described her second pain as fibromyalgia which causes her to experience pain everywhere, most especially in her joints and muscles. Id. She reported this pain also generally lasts throughout the day and it feels as though she has a "bad case of the flu" because she "aches and throbs all over." Id. She stated that nothing relieves her of this pain due to fibromyalgia. (R. 317). Plaintiff provided that she takes gabapentin and Lexapro to treat her fibromyalgia. Id.

Plaintiff described her third pain as arthritis in both her joints and her hands. (R. 317-318). She reported that heat sometimes relieves the pain she experiences as a result of arthritis and she takes oxycodone and methadone to treat her arthritis. (R. 318).

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since November 5, 2012, the amended alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.).*

3.    The claimant has the following severe impairments: obesity; mild degenerative disc disease of the cervical and lumbar spine; mild osteoarthritis; cervicalgia; headaches; fibromyalgia; chronic pain; hypertension; mild diastolic dysfunction; occasional paroxysmal atrial tachycardia; mild osteoarthritis of the bilateral hands with history of carpal tunnel syndrome/carpal tunnel release (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned

finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the work: is limited to frequent climbing of ladders, ropes, scaffolds, ramps, or stairs, balancing, stooping, crouching, kneeling,  or  crawling; must avoid concentrated exposure to extreme cold and hazards such as dangerous moving machinery and unprotected heights; entail no strict production quotas; and be limited to frequent fingering and handling bilaterally.

6.     The claimant is capable of performing past relevant work as a teacher's aide [DOT# 249.367-074, light as generally performed, medium as actually  performed,  semi-skilled]. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from November 5, 2012, through the date of this decision (20 CFR 404.1520(1) and 416.920(1)).

(R. 12-24).

## VI.     DISCUSSION

### A.     Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739

F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.    Contentions of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision is "contrary to the law and is not supported by substantial evidence when the record as a whole is reviewed by this Court." (Pl.'s Mot., at 1, ECF No. 9).  Specifically, Plaintiff alleges that the "ALJ's subjective symptoms analysis was not in compliance with regulatory and case law" (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 5, ECF No. 10). Plaintiff asks this Court to "remand this case in order that the Commissioner may correct the errors made below (Id. at 11).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1, ECF No. 13). Specifically, Defendant alleges that substantial evidence supports the ALJ's decision that Plaintiff was not disabled. (Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 7, ECF No. 14).

**C.  Analysis of the Administrative Law Judge's Decision**

    1.    **The ALJ's subjective symptoms analysis was in compliance with regulatory and case law.**

In social security proceedings, a reviewing Court must uphold the determination when an ALJ has applied the correct legal standards and the ALJ's factual findings are supported by substantial evidence. *See* Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 267 (4th Cir. 2017). As noted above, case law has defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012).

### a.  How Credibility is Analyzed

The determination of whether a person is disabled by pain or other symptoms is a two-step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id. Social Security Ruling 96–7p, which sets out factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, was superseded by SSR 16-3p effective March 28, 2016.[5] The factors mentioned remain the same, however, including:

1.  Daily activities;

---

[5] Federal Register Vol. 81, No. 51, page 14166, subsequently corrected by Federal Register Vol. 81, No. 57, page 15776; also published by SSA on their website, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di-01.html.

2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

Id. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09cv55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

A determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. However, in so doing, "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning. An ALJ's failure to consider an entire line of evidence falls below the minimal level . . ." Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995) (internal citation omitted).

A claimant's daily activities are relevant evidence when assessing his alleged symptoms. *See* 20 C.F.R. § 404.1529. However, "[w]e have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job *outside* the home." Louk v. Colvin, No. 2:16-CV-9, 2016 WL 7383814 at *22 (N.D. W.Va. Nov. 30, 2016) (citing Craft v. Astrue's, 539 F.3d 668, (7th Cir. 2008) quotation of Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) (emphasis added)). Indeed, in the types of daily activities that negate credibility include significantly demanding activities. *See* Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue); Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011) (driving, caring for horses and dogs, riding horses and operating a tractor was conflicting evidence); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination).

### b.  The ALJ's Credibility Determination was Proper

Here, for the reasons set forth below, the undersigned **FINDS** that the ALJ properly considered the record as a whole and **FINDS** the ALJ's determination that Plaintiff has not been under a disability, as defined in the Social Security Act, from November 5, 2012, through the date of the ALJ's decision as required by 20 CFR 404.1520(f) and 416.920(f) was proper and based on substantial evidence. The undersigned further **FINDS** the ALJ's conclusion that Plaintiff has the residual functional capacity ("RFC") to perform her past relevant work as a teacher's aide is also based on substantial evidence. Finally, the undersigned agrees that any physical or mental limitations the Plaintiff has are accommodated by limiting the Plaintiff to light work with postural and environmental limitations and no strict production quotas. The

Plaintiff's medical records and her own testimony provided at the Administrative hearing held on December 1, 2016, frequently indicated the Plaintiff was performing significant and strenuous work activity subsequent to her amended alleged onset date of November 5, 2012.

The work activity indicated in Plaintiff's medical records and provided by her own admission at the Administrative hearing are of the kind of daily activities that are significantly demanding and negate Plaintiff's credibility as provided in the case law cited herein. (*See* Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001); Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003)).

Medical records dated November 20, 2012; just fifteen days after Plaintiff's alleged onset date of disability reveal Plaintiff was seen by Dr. Leonard Kinland at the Brunswick Jefferson Medical Office. (R. 374). During this visit, Dr. Kinland noted that Plaintiff is better, "now back to work" (Id.) and that she was "managing high level activity." (R. 375).

On January 21, 2013, Plaintiff reported low back pain and left leg numbness during a follow-up with Dr. Kinland. (R. 370). Dr. Kinland provided that Plaintiff's reported symptoms began on January 18, 2013 after "falling from a roof", approximately six feet. Id. Dr. Kinland further provided that Plaintiff "works helping friend do construction". Id.

A progress note from Shenandoah Preventive Medicine dated March 26, 2013 states the Plaintiff's chief complaint was her lower back, (R. 430) and goes on to state the cause of her pain was a result of when Plaintiff fell one week ago while "roofing" after she "tripped on a tarp" and landed on her left knee cap. Id.

On April 15, 2013 during yet another separate appointment with Dr. Kinland, he stated the Plaintiff presented for a follow-up regarding her back and leg pain. (R. 367). During this

appointment, Dr. Kinland stated the Plaintiff "does construction work" and that she "wants to try to be off work for 2 weeks." Id.

A treatment note from July 16, 2013, indicates Plaintiff suffered a "15 ft. fall" further indicating Plaintiff was performing more strenuous daily activities than she alleged she is capable of doing. (R. 440). A progress note from November 14, 2013 lists the Plaintiff's occupation as "self-employed cleaning houses," (R. 448) again providing further evidence the Plaintiff was performing strenuous and substantial work over a year after her alleged onset date indicating Plaintiff has not been disabled since that time.

By the Plaintiff's own admission at the Administrative hearing on December 1, 2016, when questioned by the ALJ regarding construction work, she stated, "I helped a gentleman that I knew for a part-time basis. Yeah, actually, I did do a little bit of construction. Helped him roof a couple houses, and did just general building walls, you know, from two-by-fours, yeah." (R. 49-50). Although Plaintiff went on to state in her testimony at the hearing that she only helped with construction for "a couple days when he didn't have employees or somebody wasn't there" (R. 50), the medical records cited above indicate this strenuous daily activity continued for several months with medical records explicitly mentioning construction work and roofing between dates of January 21, 2013 and April 15, 2013, and self-employment cleaning houses in November of 2013. Such activity is wholly inconsistent with Plaintiff's claim that she has been under a continuous disability since the time of her alleged onset date of November 5, 2012.

### c.  Plaintiff's Physical Limitations related to her Cardiac Impairments and Bilateral Leg Edema are Reasonably Accommodated.

Further, while Plaintiff argues a significant part of Plaintiff's claim for disability benefits involved pain and fatigue caused by her cardiac and chronic pain impairments, specifically her bilateral leg edema and a need to "elevate her legs most of the day", such mention of these

conditions does not appear in Plaintiff's medical records until 2015 and 2016, nearly three years after her amended alleged onset date. (*See*, R. 604-605, 627-628, 658, 716, 718, 795, 822, 869, 874, 958, 1095, 1129, 1131-32).

While there is credible evidence that Plaintiff suffers from bilateral leg edema and indeed may have a need to "elevate her legs" for relief, it is not evident in the medical records that such impairment has existed since the Plaintiff's amended alleged onset date of November 5, 2012. Further, Plaintiff's medical records reveal no more than trace edema or mild edema in her legs and while treatment records have provided that she should "elevate her legs" to relieve the edema (R. 604-605), no record indicates a need to keep her legs elevated throughout "most of the day."

In fact, to the contrary, treatment notes from Plaintiff's medical records throughout 2016 indicate the edema in her legs had improved or was minimal, she had full range of motion in her extremities, and her medications were "working well." (R.1131, *See* R. 795, 822, 869, 874, 960, 1095). Indeed, a consultative examination performed by Dr. Seth Tuwiner on September 27, 2016 noted no edema in Plaintiff's "distal extremities" and further described the range of motion in her legs as normal. (R. 1084). Dr. Tuwiner opined Plaintiff could be expected to stand and walk approximately five to six hours in an eight hour day, she had no limitations with sitting, and could lift 40 pounds occasionally and 20 pounds frequently. (R. 1085).

As a result, the undersigned **FINDS** the ALJ's conclusion that Plaintiff's cardiac condition and resulting bilateral leg edema are improved with medication modification and any limitations "the claimant may experience due to her cardiac condition are accommodated with the reduction to a light exertional residual functional capacity with postural and environmental limitations and no strict production quotas" is reasonable and based on substantial evidence.

### d.  The ALJ Properly Completed the Two-Tiered Symptoms Analysis

While Plaintiff also argues that the ALJ "did not properly complete the two-tiered subjective symptoms analysis when he failed to provide a subjective symptom analysis that both considered inconsistencies in the evidence and cited to evidence in support of his finding that Torlone's allegations were not substantiated by the record", the undersigned disagrees.

The ALJ cited to Plaintiff's work history as undermining her allegations, stating "[w]hile the claimant has no reported earnings subsequent to her amended alleged onset date; the claimant frequently reported to her medical providers that she was working . . . [t]hus indicating greater functional abilities than alleged by the claimant." (R. 22). Given the evidence in the record, the undersigned finds no reason to disagree with the findings of Dr. Binder and Dr. Boukhemis, both of whom were of the opinion that Plaintiff could perform a range of light work with postural and environmental limitations as noted in the Plaintiff's residual functional capacity ("RFC"). Nor is there evidence to suggest Plaintiff would be unable to return to her past relevant work as a teacher's aide given the Plaintiff's RFC and her medical records taken as a whole.

Furthermore, no medical source, state agency or otherwise, opined that plaintiff was disabled. As a result, the opinions of treating physicians and non-treating, non-examining physicians were not in conflict and the ALJ properly afforded the opinions weight. The undersigned accordingly **FINDS** the ALJ's decision was based on substantial evidence.

### VII.    <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **DENIED**, Defendant's Motion for Summary Judgment

(ECF No. 13) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

DATED: November 6, 2018

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

45